v. Becton Dickinson & Company Mr. Chandler? Thank you, Your Honor, and may it please the Court. I'm Adam Chandler here for the United States in support of the appellants. I'd like to just make a small but important point. The government filed a brief in this case because we were concerned about the enforcement implications of the district court's judgment, which we thought misapplied this court's precedence. The rule of this circuit is clear and sensible. The first purchaser outside a conspiracy can sue. The rule is also relatively easy to apply in this case, although I note, Chief Judge Wood, your question about this looking more complicated than a traditional linear distribution chain. It does feature that chain in one respect. It does have manufacturers, distributors, and consumers, and we think that is sufficient to resolve the Illinois brick issue without even So you don't think we need to look at the GPO role in all of this? No, Your Honor. Actually, the other thing that the other side has urged us to look at is the Supreme Court's concerns about tracing, where does the overcharge go, if it starts at Becton, then how much of it is absorbed by the distributor and how much is passed on and so on. Right, Your Honor. To begin, no, I don't think the GPOs even need to factor into the analysis at all, but if anything, I think it makes the relationship even more direct than otherwise since GPOs have providers as members. But to your second point about the perceived difficulty of potentially tracing an overcharge, there's a few responses to that. The first is that the recent Supreme Court decision, Apple v. Pepper, had to make a choice between whether the concern was about the directness or privity of parties or whether tracing an overcharge because of a pass-on claim. They had to choose which one of those two was the bigger concern, and they chose the former. They were less concerned about the presence of a pass-on claim, and it was the directness that was dispositive in that case. Well, and the other thing that was dispositive in that case was just that it was a non-traditionally structured market. It was Apple allowing the app developers, or not allowing, basically saying if you want to sell to our people, you come into our store. That's right, Your Honor. But it also, although it was a little more difficult to perceive in that case, it also had a traditional kind of distribution chain where Apple was at the top selling distribution services, and then the app developers made an independent pricing decision that the consumers then paid. As long as it ended in 99 cents, yes. That was one restriction. That's right, Your Honor. They paid to Apple. I mean, you're right, Apple's at the top of the chain, and then you had the app producers, and then you kind of had Apple again, right? That's right, Your Honor. That's where the pass-on claim came from because it did have that structure, but because the payment went directly to Apple, the Supreme Court said those plaintiffs could sue. So it was the directness of the payment that was dispositive, not the presence of the pass-on claim. So that's one response. I'd also point the Court to the last few pages of paper systems which repeatedly contemplate that a court might have to trace an overcharge and do a pass-on calculation and seemed untroubled by that and did not think that warranted a separate rule. And the final point I'll make on this is that it's not at all clear from the complaint that there is even an opportunity for a pass-on here. That's because the GPOs and the manufacturers set the prices in those net dealer contracts. And as the district court recognized, the distributors don't have a hand then in setting the prices. The only thing that might allow them to absorb the overcharge is that they charge a percentage markup on top of the prices set in the net dealer contract. But that was not actually in the complaint alleged to be part of the scheme or part of the exclusive terms. So the Court should not just assume that there is even pass-on happening in this case. We don't think it's clear. But because it's the motion to dismiss stage, you ought to take inferences in favor of the plaintiffs. Thank you very much, Mr. Chandler. We appreciate it. Well, certainly if anybody has any issues. Thank you, Your Honors. Thank you. Good morning. Good morning, Your Honors. Robert Atkins. I represent the Appellee Becton Dickinson. Let me start by saying or trying to reframe this. We do think this is the paradigmatic case forbidden by Illinois BRIC. And conversely, it's the polar opposite of the vertical price-fixing conspiracy exception we've seen in this Court's cases. But, you know, I mean, you can call it the paradigmatic Illinois BRIC situation. But it's messy above the level of the provider, to say the least.  Or I'll even call it a joint venture or something creates, you know, one unity no matter how people are performing different roles. Somebody may be manufacturing. Somebody may be setting a price. Somebody may be creating distribution services. Above the provider, the first real independent sale goes to the provider. So much of what the Court was concerned about in Illinois BRIC isn't there. I would respectfully disagree. I think that the reason that the exception has only come up in this rare handful of vertical price-fixing conspiracies is that the sort of the fulcrum, the pivotal issue is, is there a passed-on overcharge? There's no dispute here. It's what's alleged. It's what's been briefed. The reply brief, the first argument is passed-on overcharges do not prevent suits. That's exactly what's prevented. Why? Because it's the passed-on overcharge that leads to the, I think what this Court said, exquisitely difficult problem of tracing the overcharge and then apportioning it throughout the distribution chain. But Apple did emphasize the relationship between the parties rather than the pass-on or their who set the price. Well, I think what Apple stands for is that, the question is, who's the first party to have paid the overcharge? Right, and that's the thing. You know, it's actually, in the sense of an overcharge, it's like my drug conspiracy, my heroin conspiracies. You know, people, money is changing hands before it reaches the final consumer. But there are really two things. I mean, your position, I think, is much more compatible with that of Justice Gorsuch than that of Justice Kavanaugh. And secondly, there's no need to apportion within a conspiracy because all members of the conspiracy, under the Pinkerton Doctrine and others, are responsible for what all other members of the conspiracy do. So all of the Supreme Court's 1977 parade of horribles doesn't really happen. Actually, this goes to the joint and several liability argument, but let me make two things. Well, because the joint and several liability argument, in part, in very large part, answers both the court's concerns about allocation. Again, you don't have to worry. You know, this actually takes us over into a Texas industry sort of inquiry. You know, in a case, is there going to be contribution or indemnification or what have you? And we have that answer. The liability or not of the distributor doesn't eliminate the tracing and overcharge, rather apportionment problem. Why? If the final price is set by actually the GPO with whatever add-ons the distributor has, there's just a price that the provider has to pay, and then somebody has to decide how much of that price was anti-competitively driven. In the case in which a distributor is also liable, the amount of the overcharge that a downstream customer could conceivably recover, setting aside the Illinois brick problem, can only be the amount that it's charged. And so, I mean, that's under Section 4 of the Clayton Act. You can only be—we can only recover the damage you have sustained. So whether or not the distributor is a plaintiff, as is often the case, or a defendant, or not there at all, the only amount that the downstream customer, again, setting aside the Illinois brick problem, could conceivably recover is what they actually paid. And that will require tracing the overcharge. Now, would you agree that the logic of your position requires us to overrule paper systems in all of our cases that have recognized that conspiracies are different? Not at all, Your Honor. Why not? Because the principle there is that if there is a conspiracy in which the distributor and the manufacturer are getting together to impose the overcharge, the inflated price, on a downstream customer, then Illinois brick is simply not implicated. That's not an Illinois brick problem. Why haven't you described this case where there are quite a few mutual interests in the way this market is structured? There are always mutual interests. It is not an uncommon— No, but I mean above the provider level. There's nothing unusual about a distributor, quote, benefiting because it gets a markup on top of a price charge by a manufacturer. If Becton Dickinson were alleged to be a monopolist, as it has been in these sort of other versions of this case, the distributor would still be better off marking up an inflated monopoly price. That's the double monopoly problem. I mean, that's—yeah. No, but the point is the mere fact that a distributor benefits from the supplier's inflated prices doesn't make it a conspiracy. And most importantly— I mean, obviously, here we are in 12B6, what do we know? But, you know, the reciprocity that's alleged, which would take us out of that. Well, I'm not sure what reciprocity means. It means that the distributor is better off because it marks up an inflated price. But the manufacturer is worse off if the distributor charges a monopoly price for distribution services. The manufacturer's interest is always to keep distribution prices down. So if the manufacturer is, in fact, enhancing the distribution cost, what explains that? But here we don't have that because there is competition among the distributors for distribution services. There's no allegation that any one of—I think there are four distributors in the case. There's no argument that either one of—none of those is a monopolist. But they're being bought off, allegedly. They're getting more for their distribution services than they would have been. Well, as I said, the fact that they get more because they can mark up— Against the manufacturer's self-interest. That's not against the manufacturer's self-interest because— To be overcharged for distribution? No, the manufacturer is not being overcharged for distribution. And this—let me—I think it's helpful to re-anchor this in the actual allegations. The allegation here—and let me just read from paragraph 42. What's the first thing that happens? As an initial matter, Becton and the GPOs, on behalf of the downstream customers, enter into contracts that control the pricing. The distributors aren't at the table. They're not present. They're not parties. They're not participants. Everything that's allegedly an exclusive deal with an inflated price and an overcharge is done, baked, before the distributors arrive. They describe the distributors as absent. Here's what happens next. Once a health—this is paragraph 44, I quote. Once a health care provider decides—that's the plaintiff—to purchase Becton products pursuant to its contracts negotiated by its GPOs, then it—the customer, the plaintiff—it selects a distributor. To do what? To deliver Becton's products and pass on the overcharge. Here's paragraph 35. So what happens is Becton and GPO, on behalf of health care providers, negotiate a price to the distributor. But that's not only—that's not the only money the distributor gets. The distributor doesn't just get the payment from the provider. The distributor is getting payments from the manufacturer as well. That allegation is nothing more than the sort of ubiquitous practice of suppliers giving incentives and providing promotional materials to wholesalers in order to carry their product and stock it. There's nothing different, unique, or conspiratorial about offering to pay sales commissions to distributor reps who go around with their bag of products and give Becton preference over maybe one of its competitors. That does—that's not unique. That doesn't create a trust conspiracy. But you agree that it's an additional payment. We'll have to decide what the significance is. I would agree that they have alleged that Becton— So we have to assume right now. Obviously. I'm sure you would come in later and— No, that I'm not—we'll see what happens. I mean, I've already tried this case, so I'm kind of putting that aside. I mean, it's sort of surreal to be up here. I've tried everything that was alleged and won the case, and the Fifth Circuit, as you know, declared it to be meritless. But forgive me. But let me finish on the allegation. So first thing that happens, Becton and the GPO, on behalf of the plaintiffs, negotiates a price that Becton is going to charge the distributor. That's the net dealer price. Distributors nowhere to be seen. They are, in their words, absent. The next thing that happens is the plaintiff, a hospital health care provider, it decides it wants to buy Becton products. And what does it do? It goes to its distributor. It selects—I'm quoting the complaint—it selects a distributor. Becton doesn't select the distributor. The hospital does. And what does it ask the distributor to do? Quote, to deliver Becton's products. Under the terms of the GPO contract, which the distributor has nothing to do with, has no role in, wasn't present. And this is critical. Paragraph 35. The last thing that happens— There's distributor agreements. It's actually not that complicated. Number one, GPO contract. That's the net dealer contract. But why doesn't that put all of them in a unity of interest? That's what I still don't understand. Because if they are in a unity of interest, then the first person outside the club is the provider. To the contrary, Your Honor. If there was a conspiracy here, the plaintiffs are part of it. Their GPOs—and as Mr. Mello said, sometimes they do this directly—their GPOs go to the manufacturers and say, please give me a price that you will charge my distributor. Then I'll separately make a distribution agreement with my distributor—that's alleged—to sell me that product at that price with your profit margin. There's nothing circular. There's no web. It's a vertical distribution chain. And I think this is critical. Paragraph 35, the last thing that happens. So there's a contract between Becton and the customers. The customer picks a distributor and says, go fetch, go get it from Becton. On what terms? Pursuant to the contract, I, the customer, have negotiated with Becton. The distributor is nothing but a delivery service. And here's the key. I've got to get this out. Paragraph 35, the last thing that happens. The distributor purchases from Becton on terms dictated by the contracts with the downstream customers and then resells to the customers. The distributor here is, in fact, nothing other than a pass-through, a pass-on. Their function is to buy it and pass it on to the customer. Thank you very much, Mr. Atkins. Mr. Gershengorn. Good morning, Your Honors, and may it please the Court. Ian Gershengorn on behalf of the GPOs and distributors. I'd like to pick up on, Judge Wood, on your first question to Mr. Mollo and explain why there is not an adequately alleged conspiracy here. And I'd like to get out two reasons briefly at the start and then discuss in more detail. First, although plaintiffs have premised their claim on an overarching conspiracy, as Your Honor said, a web, they have failed entirely to allege any agreement at all between or among the distributors and between or among the GPOs. Well, it doesn't have to be between or among. That said, surely you can include a distributor and manufacturer agreement, an agreement between the distributors, or kind of the cross payments from the manufacturer to the GPO. It's a group. Respectfully, the answer is no, and here's why. What you have, what Your Honor has postulated, and without that, forgive the rim, what you have is multiple vertical conspiracies. That is not sufficient. That's the case of Dixon. Remember, Dixon is Microsoft and then Dell and Compaq. But, you know, let me stop you on multiple vertical conspiracies. I know that's a big part of your argument. But actually, if you look back to the way the Supreme Court has treated vertical arrangements over the now many decades, you see the court concerned about the illegality of parallel vertical arrangements, even going all the way back to 1911 and Dr. Miles, where the court says all of these vertical arrangements could add up to a dealer cartel. Now, we all know in Legion the actual rule of Dr. Miles gets overruled, but the dealer cartel concern didn't evaporate at that time. So, Your Honor, you're absolutely right, but I think it's critical to distinguish what all of the Supreme Court's cases involve and what this court's case in Toys R Us involved and what Dixon and Hess did not have. Remember, we have Dixon and Hess saying that multiple vertical conspiracies without some tie around the rim is not actionable. That's not quite what we said in Toys R Us, although I will grant you that in Interstate Circuit and in Toys R Us, the fact was that the various people, let's say the toy manufacturers, wanted some assurance that they weren't out there on a limb by themselves. But I would suggest that the allegations in this market are that the GPOs, we're talking about very small numbers of companies here, after all. This market is structured in a highly concentrated way. That must be relevant. So, Your Honor, it could be relevant, but it has to be beyond mere knowledge. And, Your Honor, if I could just step back. Toys R Us is a perfect example. As Your Honor said, the toy makers required assurances that everyone was going to be there. They were acting against economic self-interest, giving up sales to the wholesalers. In every single case that the plaintiffs cite, there has been some agreement on the outside or some coordination. There is none alleged here. There is no agreement. There is no communications. How do you say that there's none alleged? I'm sorry. I just don't understand. I left out a clause which is critical. There is no agreement alleged among the GPOs or among the distributors that would tie the multiple conspiracies together. There are no conversations among the GPOs or back and forth with Becton that would tie together the distributors. Well, it's the back and forth with Becton. I'm glad you just added that because I think it is, in fact, through Becton that the GPOs and the distributors are playing their part. But this is not a case in which the plaintiffs are alleging that there was a distributor conspiracy. It's a case in which the plaintiffs are alleging that Becton, through the distributors and the GPOs who were playing ball with them, helping them do this, led to anti-competitive results at the provider level. But, Your Honor, one more time, I'm not aware of any case in which there is no evidence at all of communications by, say, for example, the distributors or GPOs to Becton about the other distributors where there's no agreement among the distributors. Why does that matter if what each distributor is doing is helping Becton monopolize the market? Because it's precisely the difference between multiple vertical conspiracies and horizontal. If I could pick up, Your Honors, your drug hypo for one second, this court's Bustamante case, right? What that was was a series of vertical drug deals, which Your Honor recognized. And what the court said was the first defendant, he's in because he tried to help one of the other drug dealers. The second defendant, he's in because he had a big garage which stored more than his share. But the third defendant was not in, even though he was aware of the conspiracy. Oh, sure. That's the buyer-seller doctrine. And that is exactly this case. There is no tie among the distributors. So if we were to agree with you that there was no tie, then I think you'd be right, the buyer-seller. But on the allegations. I don't think Your Honor will find a single allegation, if I might. I don't think that Your Honor will find a single allegation of agreement among the rim, of communications among the rim. No, but communications at the rim level up through the manufacturer and back down again. But it has to go out to the sides again because otherwise it's the multiple vertical conspiracies. Do you think people in this market didn't know that GPOs were operating? Your Honor, if I get one thing across, it is the position that knowledge alone is not sufficient for agreement. Hess says that you need something else. But if I could just pivot in my short time to the second argument, which is that they have brought in the distributors. And Your Honor, they need the distributors to get around Illinois brick. And so Your Honor, you asked about enforcement. There is no enforcement here. There's no refusal to deal. There's no contact against. What do we have? We have an agreement to enforce a contract that the distributors have no involvement in creating. There are payments from Becton, as Mr. Atkins said. Those are payments to promote or prioritize a manufacturer's product routine across industries in distribution all around the country. And third, there are payments to GPOs when the complaint alleges the GPOs provide valuable service. None of those are against self-interest. None of those require assurances that the other distributors are involved. And they are brought in. The distributors are brought in. This seems to me critical. The distributors are brought in because plaintiffs come to them with a signed contract, and they say to the distributors, please give me my product. Please give it to me at this price. It cannot be an antitrust violation for a distributor who has hundreds of thousands of products, right? Band-aids, syringes, splints, you know, medicine. I think we have your point. Just say it. All right. Thank you, Your Honor. Thank you very much, Mr. Gershengorn. All right, Mr. Molo, you've got two minutes and 17 seconds. Yes, Your Honor, two minutes and 16 seconds. First, as to Becton's arguments, who sets the price is irrelevant. Who participates in the conspiracy is what matters. Apple recently, Justice Kavanaugh, said that they were trying to convert the direct purchaser rule into a who sets the price rule. And so that's just not an issue here. On this Fifth Circuit case, the retractable case, the plaintiffs there were competitors. It was a Section 2 claim. Conspiracy wasn't alleged. The Becton point about there being problems with apportioning liability, the question is, is there an apportionment of damages among various categories of purchasers, of innocent purchasers? And there is none under this because, as paper system holds, there's joint and several liability. The first innocent purchaser can collect the full amount of damages. So Mr. Atkins insists that we still need to engage in some analysis of the pass-through before we figure out what was anti-competitive about the price that came out at the end of the process. But that, as the opinion says in paper systems, is irrelevant to the question of who has standing. Ultimately, we're entitled to pay to – So you're just focusing specifically on can you go forward with this case? You want us to worry about damages later. Damages would be later. Although Illinois BRIC does worry about damages amounts up front. But there's no concern about it here because of the joint and several liability. And the fact that we're entitled simply to the difference between what we paid and what we would have paid in an honest market. It's quite that simple. Do you think you can just predomit the whole passing on thing by saying, here's what a competitive price would have looked like using your economic experts? In the market world, that's why there are economists and econometrics. And lastly, if you accept their position, there could be no private enforcement of the antitrust laws in this context because we have alleged – and again, we have to prove this – but that the distributors are, in fact, part of the conspiracy. If we're not allowed to bring this claim and the distributors are conspirators, there's no one that's going to bring this claim. And, of course, the enforcement of free markets and honest markets is largely dependent significantly on the work of private plaintiffs. And their rule would throw it out. As to the conspiracy claims, I think we've been through it all and we've clearly pled what's there. And that no individual act examined on its own is sufficient to take it out of the realm of what has been pled as concerted activity. Thank you very much for your time. Thank you very much. Thanks to all counsel. We'll take the case under advisement.